**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Notestine*, Slip Opinion No. 2025-Ohio-2415.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-2415

IN RE APPLICATION OF NOTESTINE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Notestine*, Slip Opinion No. 2025-Ohio-2415.]**

*Attorneys—Character and fitness—Application to register as candidate for admission to practice law in Ohio and as candidate to take July 2025 bar exam—Past criminal conduct—Applicant has established present character, fitness, and moral qualifications by clear and convincing evidence—Applications approved.*

(No. 2025-0604—Submitted June 3, 2025—Decided July 8, 2025.)

ON REPORT by the Board of Commissioners on Character and Fitness of the Supreme Court, No. 916.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and DEWINE, BRUNNER, DETERS, and SHANAHAN, JJ.  HAWKINS, J., dissented, with an opinion joined by FISCHER, J.

**Per Curiam.**

{¶ 1} Applicant, Bethany Joy Notestine, of West Chester, Ohio, expecting to graduate from the University of Cincinnati College of Law in May 2025, applied in November 2023 to register as a candidate for admission to the practice of law in Ohio by completing a National Conference of Bar Examiners ("NCBE") questionnaire. And in March 2025, she applied to take the July 2025 bar exam.

{¶ 2} Two members of the Cincinnati Bar Association Admissions Committee interviewed Notestine in October 2024. Each of the interviewers submitted a detailed report to the admissions committee, addressing four primary issues of concern: (1) Notestine's history of marijuana use, which resulted in minor-misdemeanor convictions in 2004 and 2006; (2) her 2005 conviction on a fifth-degree felony count of possession of heroin; (3) her 2008 conviction on a federal charge of conspiracy to distribute, attempt to distribute, and possess with intent to distribute heroin; and (4) her 2017 conviction for disorderly conduct. Both interviewers approved Notestine's character, fitness, and moral qualifications and recommended that she be accepted for admission to the practice of law in Ohio.

{¶ 3} In December 2024, the admissions committee issued a provisional report, recommending that Notestine's character, fitness, and moral qualifications be approved. In March 2025, a three-member panel of the board conducted a hearing, during which it heard testimony from Notestine. Thereafter, the panel issued a report finding that Notestine be approved as having the requisite character, fitness, and moral qualifications for admission to the practice of law in Ohio. The Board of Commissioners on Character and Fitness adopted the panel's report by a vote of eight to two.

{¶ 4} The matter is before this court pursuant to Gov.Bar R. I(13)(D)(5)(a) and (b) because Notestine's federal conviction would have been a first- or second-degree felony under Ohio law. For the reasons that follow, we find that Notestine has established that she presently possesses the requisite character, fitness, and

2

moral qualifications for admission to the practice of law in Ohio, and we permit her to sit for the July 2025 bar exam, provided that all other application requirements, including but not limited to the requirements of Gov.Bar R. I(3)(E) (requiring an applicant to submit certain documentation regarding his or her educational qualifications), have been satisfied.

## I. Facts

### A. *Notestine's Drug-Related Offenses*

{¶ 5} Notestine testified that she started using marijuana in high school to self-medicate debilitating migraines that sometimes resulted in hospitalization. She explained that the medications prescribed to her were ineffective and that marijuana was the one thing that relieved her pain. While she currently holds a medical-marijuana card, the drug was not approved for medical use when she started using it. She stated that in order to obtain the drug, she was "going to places where other things [were] being sold" and exposing herself to people and experiences that lowered her moral compass.

{¶ 6} Notestine was first convicted of marijuana possession, a minor misdemeanor, in July 2004, when she was 20 years old. She testified that, unbeknownst to her, a friend who was riding in her car lit a marijuana cigarette. The police pulled Notestine over, searched the vehicle, and ticketed her after finding her own unsmoked marijuana cigarette. Notestine stated that she considered the offense to be like receiving a traffic ticket; she paid the fine but did not take it seriously or change her behavior.

{¶ 7} Notestine testified that while she was using marijuana illegally, she spent time around drug dealers and that after seeing them sell "bad drugs," including heroin, to other people, she thought selling drugs would not be hard to do. She stated that she purchased less than a gram of heroin with the intent to sell it. Approximately one week later, two of her associates suggested that they go out to eat. As she drove into the restaurant parking lot, her vehicle was rushed by law-

enforcement officers. The officers found the heroin on Notestine's person and arrested her.

**{¶ 8}** Notestine testified that she never sold any of the heroin she purchased but that she had taken it with her that day with the intent to sell it. In August 2005, she pleaded no contest in the Hamilton County Court of Common Pleas to a fifth-degree felony count of heroin possession. The court sentenced her to two years of community control, suspended her driver's license, and ordered her to submit to random drug testing for six months. With her NCBE questionnaire, Notestine submitted a copy of an August 28, 2007 entry of the common pleas court terminating her community control and closing the case.

**{¶ 9}** In July 2006, after finishing the drug-testing portion of her sentence, Notestine decided to smoke marijuana again. Hours later, federal agents came to her home to investigate a conspiracy case involving the two associates with whom Notestine had previously been arrested. Agents found the marijuana, which resulted in a second minor-misdemeanor conviction for possession of marijuana.

**{¶ 10}** In October 2006, an indictment was filed in the United States District Court for the Southern District of Ohio, Western Division, naming Notestine and eight others who were associates in an illegal-drug network—two being those who were with Notestine during her heroin-possession arrest. The indictment alleged that Notestine and her associates had engaged in a conspiracy and racketeering to possess and distribute large quantities of heroin and cocaine and that in furtherance of that conspiracy, her associates possessed numerous firearms and body armor, threatened a witness at gunpoint to prevent his testimony in another case, and participated in robbery and murder.

**{¶ 11}** On May 17, 2007, Notestine pleaded guilty to conspiracy to distribute, attempt to distribute, and possess with intent to distribute in excess of one kilogram of heroin and an amount of cocaine. In April 2008, she was sentenced to ten years in prison and was ordered to serve six years of supervised release.

4

**{¶ 12}** During her character-and-fitness hearing, Notestine testified that she had been accused of driving from Ohio to New York to pick up a large amount of heroin in furtherance of the conspiracy. But she denied those allegations. Notestine testified that she had appealed her conviction in order to provide evidence that she had not made the trip to New York but that she later found out that her state conviction for possession of heroin was sufficient to convict her as part of the conspiracy. She explained that she was a minor player who got swept up in a much larger crime. But she also acknowledged that she had made horrible decisions by associating with people who were selling drugs and carrying guns.

### B. Notestine's Efforts to Better Herself

**{¶ 13}** Notestine testified that she chose to better herself while in prison, recognizing that "you can either consume your demons or let your demons consume you." She had been attending school for medical massage at the time of her arrest for heroin possession and had her books sent to her in prison so she could continue to study for her licensing exam. She also participated in an Ohio University program that allows incarcerated people to take college courses by mail. And after she was transferred to a second prison, she took additional classes offered there.

**{¶ 14}** Notestine also testified about participating in an intensive nine-month residential-drug-abuse-treatment program, which focused on helping her recognize her faulty thinking habits and how to pull herself out of them. She was selected to be a peer leader to help others who were struggling in the drug-treatment program. In addition, she participated and excelled in the UNICOR reentry program,[1] working in a call center to learn new job skills.

---

1. UNICOR, a program within the Federal Bureau of Prisons, is designed to help incarcerated persons "acquire the skills necessary to successfully make [the] transition from prison to law-abiding, contributing members of society." UNICOR, *About the Federal Prison Industries Program*, https://www.unicor.gov/about_fpi_programs.aspx (accessed on June 12, 2025) [https://perma.cc/9KDY-F8P2].

**{¶ 15}** Notestine was released from prison in January 2014 (after serving more than seven years of her ten-year sentence) and was sent to a halfway house. Within days of her release, she began working at a print shop. She left the print shop in August 2014 and started working as a work-opportunity-tax-credit consultant for Linnabary and Associates.

**{¶ 16}** Notestine also continued to pursue her medical-massage license. She passed the Massage and Bodywork Licensing Examination for medical massage on her first attempt in August 2014. And in April 2015, she submitted the application for her medical-massage license to the Ohio Medical Board. When the medical board informed her that her convictions could prevent her from obtaining her license, Notestine requested a hearing to demonstrate her ability to comply with the regulations governing the license she sought to obtain.

**{¶ 17}** At a February 1, 2016 hearing, Notestine presented evidence and testimony from herself and eight character witnesses. The hearing examiner made extensive findings of fact and conclusions of law, ultimately recommending that Notestine be granted a certificate to practice massage therapy and that she be required to serve a probationary period of at least two years. In May 2016, the medical board granted Notestine's application and ordered that she serve at least three years of probation.[2] Notestine's federal supervised release was terminated in June 2017. The probationary period required by the medical board was terminated in August 2019.

**{¶ 18}** While Notestine's application for her medical-massage license was pending, she also trained to become both an esthetician and a nail technician. She obtained advanced licenses in both fields through the Ohio Cosmetology and Barber Board in 2017. The following year she obtained her independent-contractor

---

2. Notestine submitted with her NCBE questionnaire a certified copy of the hearing examiner's report, excerpts from the minutes of the board meeting, and the board's order.

license, which allowed her to operate her own salon. She later opened her own business.

{¶ 19} Notestine testified that she enrolled in an online undergraduate program through Ohio University in 2019, but because of the lack of desired course offerings, she transferred to Sinclair Community College and then to the University of Cincinnati. She worked about 70 hours a week while carrying a full course load and graduated in 2022. Notestine began studying law at the University of Cincinnati College of Law in August 2022. She stated that she continued to run her business, which included two salons, full time during her first year of law school "to ensure that [she] had something to stand on, just because [she] understood it's very difficult to get a job with [criminal] convictions."

{¶ 20} Beginning in May 2023, Notestine served a one-year fellowship with the Ohio Innocence Project. And in May 2024, Notestine obtained her legal-intern certificate from the Office of Bar Admissions, allowing her to work with the Hamilton County Office of the Public Defender.

### C. 2017 Disorderly-Conduct Conviction

{¶ 21} Notestine testified about the one setback she has experienced since being released from prison in 2014—her arrest, guilty plea, and conviction on a single minor-misdemeanor count of disorderly conduct in 2017.

{¶ 22} Notestine claimed that her bipolar ex-boyfriend, a retired NFL player—who had previously hit her—drugged her and took her to a club, where the mother of his child and her friends jumped her. Notestine testified that she fought back and was arrested. She believed that the incident was a setup to exact revenge for her breaking up with the ex-boyfriend and that the responding police officer was a party to the setup because the other women knew him and called him "uncle." Notestine claimed that after the officer arrested her, he gave her ex-boyfriend her keys, purse, and cellphone. And although she found her vehicle a few days later, she never recovered her cellphone or purse.

{¶ 23} Following that incident, Notestine commenced therapy for her mental health. She stated that she was "in a much better place" at the time of her character-and-fitness hearing. She accepted responsibility for her actions and acknowledged that she could have handled the matter differently, stating, "[I]t was a hard lesson to learn, but I learned from it."

## II. The Board Recommends Approval of Notestine's Character and Fitness

{¶ 24} The board found that at the time of her character-and-fitness hearing, Notestine was a 41-year-old woman who "now surrounds herself with really good people who support her, including her family." The board noted that she has mentors on whom she may rely, and that she has developed healthy habits and ways to deal with stress. It also acknowledged Notestine's desire to use her experiences to help people who are in bad situations to understand that they can change the trajectory of their lives.

{¶ 25} Finding that Notestine has fully accepted responsibility for her conduct and the consequences of her actions, and that sufficient time has elapsed since her criminal convictions, the board concluded that Notestine had proved by clear and convincing evidence that she has the present character, fitness, and moral qualifications for admission to the practice law in Ohio.

### III. Disposition

{¶ 26} This court exercises exclusive original jurisdiction over the "[a]dmission to the practice of law, the discipline of persons so admitted, and all other matters relating to the practice of law." Ohio Const., art. IV, § 2(B)(1)(g); *Royal Indemn. Co. v. J.C. Penney Co., Inc.*, 27 Ohio St.3d 31, 34 (1986).

{¶ 27} An applicant for admission to the bar bears the burden of proving by clear and convincing evidence that he or she possesses the requisite character, fitness, and moral qualifications for admission. Gov.Bar R. I(13)(D)(1). An applicant may be approved for admission if he or she satisfies the essential eligibility requirements for the practice of law as defined by the board and

demonstrates that his or her "record of conduct justifies the trust of clients, adversaries, courts, and others." Gov.Bar R. I(13)(D)(3).

{¶ 28} "A prior felony conviction does not demonstrate, per se, that an applicant lacks the moral character necessary to practice law." *In re Application of Poignon*, 2012-Ohio-2915, ¶ 16, citing *In re Application of Keita*, 1995-Ohio-33, ¶ 7, citing *In re Application of Davis*, 38 Ohio St.2d 273, 275 (1974). "But when an applicant's background includes such a conviction, the applicant bears the burden of proving that he or she is morally fit to practice law and that he or she is fully and completely rehabilitated." *Id.*

{¶ 29} In determining the weight and significance to give an applicant's prior conduct, we consider several factors, including the recency of the conduct, the seriousness of the conduct, the factors underlying the conduct, whether there is evidence of rehabilitation, whether the applicant has made positive social contributions since the conduct, and the candor of the applicant in the admissions process. *See* Gov.Bar R. I(13)(D)(4)(b), (d), (e), (g), (h), and (i).

{¶ 30} When an applicant has been convicted of a felony, we also consider the amount of time that has passed since the conviction; whether the rights and privileges of the applicant that were forfeited by conviction have been restored by operation of law, expungement, or pardon under the laws of Ohio; whether the applicant is disqualified by law from holding an office of public trust; and how approval of the applicant would impact the public's perception of, or confidence in, the legal profession. *See* Gov.Bar R. V(13)(D)(5)(a)(i) through (iv).

{¶ 31} In this case, Notestine's most concerning past criminal conduct consists of her fifth-degree state-felony conviction for possession of heroin and her related federal conviction. The most recent of those convictions occurred more than 17 years ago. It has been more than ten years since Notestine was released from prison and eight years since she satisfactorily completed her supervised release.

**{¶ 32}** During her incarceration and following her release, Notestine took advantage of numerous opportunities to better herself. While in prison, she completed a 500-hour drug-treatment program and an eight-week course on fitness and health. She completed courses focused on business education, entrepreneurship, employability, fashion design, and use of the electronic law library. She worked long hours in a call center, where she learned skills that would help her with her reentry into society and received multiple performance awards.

**{¶ 33}** Although not mentioned in the board's report, the record demonstrates that Notestine has completed her community-control sentence for her fifth-degree heroin-possession conviction and that that conviction has been expunged. Therefore, the rights that she forfeited by that conviction have been restored. *See* R.C. 2967.16(C)(1) (providing that subject to certain enumerated exceptions not relevant here, a person "shall be restored to the rights and privileges forfeited by a conviction" upon final release or termination of postrelease control or community control); R.C. 2953.34(N)(1) (providing that an expungement order "restores the person who is the subject of the order to all rights and privileges not otherwise restored by termination of the sentence or community control sanction or by final release on parole or post-release control").

**{¶ 34}** Similarly, Notestine has satisfactorily completed the sentence for her federal conviction. And if she had been convicted under Ohio laws for the same offense, she would be eligible to have her rights and privileges restored under R.C. 2967.16(C)(1). Furthermore, none of Notestine's felony offenses—state or federal—is identified in R.C. 2962.16(C)(2)(c) as an offense that would prevent the automatic restoration of the privilege of holding a position of honor, trust, or profit following the successful completion of a criminal sentence.

**{¶ 35}** Notestine testified candidly about her criminal history and acknowledged the wrongfulness of her conduct. She has reflected on her past decisions, resolved to learn from them, and worked tirelessly to better herself. She

10

obtained her medical-massage license and several certifications from the cosmetology board, and she operated her own business while she earned her undergraduate and law degrees. She has completed a fellowship with the Ohio Innocence Project helping those who may have been wrongfully convicted and has worked for the public defender's office, where she has not only encouraged her clients to change the course of their lives but has served as a positive example of how it can be done.

### IV. Conclusion

{¶ 36} Upon consideration of the record and the applicable rules, we find that Notestine has carried her burden of proving that she currently possesses the requisite character, fitness, and moral qualifications for admission to the practice of law in Ohio.

{¶ 37} Accordingly, we approve Notestine's character, fitness, and moral qualifications for admission to the practice of law in Ohio and permit her to sit for the July 2025 bar exam provided that all other application requirements, including but not limited to the requirements of Gov.Bar R. I(3)(E), have been satisfied.

Judgment accordingly.

_____

**HAWKINS, J., joined by FISCHER, J., dissenting.**

{¶ 38} Today this court concludes that Bethany Joy Notestine is morally fit to practice law in Ohio and approves her application to sit for the July 2025 bar examination. Majority opinion, ¶ 37. An applicant for admission to the Ohio bar bears the burden of showing that she possesses the requisite character, fitness, and moral qualifications for admission. Gov.Bar R. I(13)(D)(1). And when, as here, the applicant's background includes a felony conviction, she must also show her full and complete rehabilitation. *See In re Application of Davis*, 38 Ohio St.2d 273, 275 (1974). Because I don't believe that Notestine has met that burden, I

respectfully dissent from this court's decision to approve her application.  I write to explain why I believe the court's judgment falls short.

{¶ 39} The character-and-fitness-review process asks a simple question: Does an applicant to the bar have the "morality, attention to duty, forthrightness and self-restraint . . . associated with the accepted definition of 'good moral character' "?  *Id.* at 274.  Though the process is nonadversarial, *id.*, it is not without significance.  Admission to the bar is a promise to members of the public—both from this court and from the legal profession—that they can trust the applicant with their affairs.  *See* Clemens, *Facing the Klieg Lights: Understanding the "Good Moral Character" Examination for Bar Applicants*, 40 Akron L.Rev. 255, 268 (2007).  Similarly, admission to the bar makes lawyers officers of the court, and with that privilege comes the duty and responsibility to maintain high ethical standards.  *Dayton Bar Assn. v. O'Brien*, 2004-Ohio-3939, ¶ 13; *see also* Prof.Cond. R., Preamble [1] ("As an officer of the court, a lawyer not only represents clients but has a special responsibility for the quality of justice.").  These are demanding expectations, and we owe it to the profession—and to the public— to admit only those who meet them.

{¶ 40} Whether an applicant meets those high standards of trust turns on her past conduct.  And that brings us to Notestine.  Notestine was charged with and pleaded guilty to a federal felony drug charge: conspiracy to distribute, attempt to distribute, and possess with the intent to distribute heroin and cocaine.  In 2008, the federal court sentenced her to a ten-year prison term for this offense.  She was released from prison in January 2014 and remained on supervised release until June 2017.  But just six months after her supervised release was terminated, Notestine again appeared in court, this time to plead guilty to disorderly conduct.  This bears a resemblance to her conduct after pleading guilty to possession of heroin in the Hamilton County Court of Common Pleas in 2005.  Following that conviction, Notestine was subject to probation and drug testing.  Yet, as soon as she had

completed her probation and was no longer subject to the court's testing requirements, she began illegally using marijuana again.  In both situations, Notestine violated the law again almost immediately after completing her court-imposed sanctions.

{¶ 41} Together these incidents show a pattern that this court shouldn't overlook.  Notestine's application does not present just a one-time mistake.  It's a story that keeps repeating.  To be sure, under this court's precedent, a felony conviction does not, in itself, prohibit an applicant from showing she has the moral fitness necessary to practice law in Ohio or prevent her from entering the legal profession.  *See In re Application of Poignon*, 2012-Ohio-2915, ¶ 16, citing *In re Application of Keita*, 1995-Ohio-33, ¶ 7, citing *In re Application of Davis*, 38 Ohio St.2d at 275.  But the problem isn't only Notestine's convictions—it's what she kept doing afterwards.  She finished her sentence and then promptly broke the law again.  Indeed, in the case of the disorderly-conduct conviction, Notestine acquired a new misdemeanor conviction less than a year after her release from federal supervision.  The record reveals a pattern: a failure of self-restraint, a disregard for the law, and a troubling absence of integrity—the kind that the public must be able to expect from members of the bar.  This leaves me with one conclusion: Notestine lacks the moral character the law demands, and we should not approve her application.

{¶ 42} Our profession does not demand perfection, but it does require integrity.  When we approve an applicant as morally fit to join the profession, we give the public our word that the applicant can be trusted to follow the law.  Because I cannot extend that promise in good conscience here, I respectfully dissent.

————————————

Bethany Joy Notestine, pro se.

Gregory A. Harrison, for the Cincinnati Bar Association.

————————————